UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 06-80718-CIV-HURLEY/SELTZER

BLUEGREEN CORPORATION,

Plaintiff,

vs.

DAVID A SIEGEL, DAVID A. SIEGEL
REVOCABLE TRUST, and CENTRAL
FLORIDA INVESTMENTS,

Defendants.

_____/

DAVID A SIEGEL, DAVID A. SIEGEL
REVOCABLE TRUST, and CENTRAL
FLORIDA INVESTMENTS,

Counter-plaintiffs

vs.

BLUEGREEN CORPORATION,

Counter- defendant,

ALAN B. LEVAN, JOHN E. ABDO, JOHN LAGUARDIA,
NORMAN H. BECKER, J. LARRY RUTHERFORD,
GEORGE F. DONOVAN, LAWRENCE A. CIRILLO,
ROBERT F DWORS, SCOTT W. HOLLOWAY,
MARK A. NERENHAUSEN, and JOSEPH C. ABELES,

Additional Counter-defendants.

_____/



## REPORT AND RECOMMENDATION

THIS CAUSE is before the Court on Defendants'/Counter Plaintiffs' Emergency

Motion for Temporary Restraining Order and Preliminary Injunction (DE 19) and was

referred to the undersigned Magistrate Judge[1] pursuant to 28 U.S.C. § 636 and the

Magistrate Rules of the Local Rules of the United States District Court for the Southern

District of Florida. For the reasons set forth below, the undersigned RECOMMENDS that

Defendants' motion be DENIED.

I.      BACKGROUND

        A.      The Parties

Plaintiff Bluegreen Corporation ("Bluegreen") is a publically traded corporation,

organized under the laws of Massachusetts with its principal place of business in Boca

Raton, Florida. Bluegreen is a provider of timeshare sales and home site properties; it

owns or operates vacation and home site properties in Florida, as well as other states.

Levitt Corp. ("Levitt"), a publically traded corporation, owns approximately 31% of

Bluegreen.

Counter-defendant Alan B. Levan is a controlling shareholder, the Chairman, and

the Chief Executive Officer of Levitt. Levan also is the Chairman, President, and Chief

Operating Officer of BankAtlantic Bancorp, Inc. ("BBC") and BFC Financial Corporation

("BFC"), which also have significant holdings in Levitt. Counter-defendant John E. Abdo

is the Vice Chairman and President of Levitt and is the Vice Chairman of the Bluegreen

Board. Counter-defendant John Laguardia is the Senior Vice President of Levitt and a

director of Bluegreen. Counter-defendants Norman H. Becker, J. Larry Rutherford, George

_____

        [1] The motion was originally referred to Magistrate Judge James M. Hopkins. Upon Judge Hopkins recusal on (Wednesday) September 20, 2006, the matter was reassigned to the undersigned. The undersigned conducted a telephone conference with the parties on (Friday) September 22 and conducted a hearing at the United States Courthouse in Fort Lauderdale, Florida on (Monday) September 25.

F. Donovan, Lawrence A. Cirillo, Robert F. Dwors, Scott W. Holloway, Mark A. Nerenhausen, and Joseph C. Abeles serve as directors of Bluegreen.

Defendant/Counter-plaintiff David Siegel is the sole trustee and beneficiary of Defendant/Counter-plaintiff David A. Siegel Revocable Trust (the "Siegel Trust") and is President and sole director of Defendant/Counter-plaintiff Central Florida Investments, Inc. Siegel is also President of Westgate Resorts ("Westgate"). Westgate, a wholly owned subsidiary of Central Florida Investments, Inc., is in the business of time share sales and rentals; it is a competitor of Bluegreen. The Siegel Trust owns all of the voting stock of Central Florida Investments, Inc. On the date Plaintiff filed its Complaint (July 27, 2006), Siegel owned approximately 1.06% and Central Florida Investments, Inc. owned approximately 6.64% of the outstanding shares of Bluegreen common stock; together, they now own approximately 31.7% of the stock.[2]

B.     The Put Options and the Shareholders' Rights Plan

Put options are contracts traded on the national options exchanges; options trading is governed by the Exchange Rules and the Securities and Exchange Commission ("SEC") regulations. CFI explains the nature of put options:

> The buyer of a put option acquires the right to "put," or to require the seller of the option, to purchase shares of a publicly-traded company at an established price, called the "strike price," at any time within an established period. A seller of an option is also referred to as the "writer" of an option. One standardized option contract generally carries with it the right to put or buy 100 shares of an underlying stock. Strike

---

[2]     For ease of reference, hereinafter the undersigned will refer to Defendants/Counter-plaintiffs Siegel, the Siegel Trust, and Central Florida Investments, Inc. collectively as "CFI."

> prices and expiration terms are set by the market.
>
> The purchaser of a put option pays the seller a premium that depends upon a number of factors, including the relationship of the strike price to the price of the underlying stock and the time remaining before expiration of the option.
>
> If the price of the publicly traded security is less than the strike price of a put, then the puts are "in the money" and the holder of a put may "exercise" the put by requiring the seller to purchase shares.  In this scenario, the put buyer may profit from the difference between the strike price and the market price of the underlying stock, depending on the premium paid for the put contract.
>
> The exercise of a put option is entirely at the discretion of the put holder and is governed by the terms of the option contract.

Defendants' Counterclaims at 6-7 (DE 18) (paragraph numbers omitted).

From June 14, 2005, through August 18, 2006, CFI sold on the open market standard, American style put option contracts for shares of Bluegreen common stock (the "puts"), each at a strike price of $12.50.  American style options may be exercised any time before the expiration date.

Under Section 13(d) of the Exchange Act, any person (or group), other than the issuer, who directly or indirectly acquires a beneficial ownership interest of 5% or more of a class of equity securities of a publicly traded company is required to disclose, *inter alia*, its holdings within 10 days of acquisition.[3]  As a result of the exercise of the puts, CFI's holdings of Bluegreen stock increased.  According to CFI, on July 10, 2006, it held 2,349,800 shares, representing 7.7% of the outstanding Bluegreen common stock.

---

[3] Section 13(d) also requires such person or group to disclose the purpose of its acquisition and its intentions with respect to the company.

4

Consequently, on July 20, 2006, CFI filed with the SEC a Schedule 13D, disclosing its holdings; CFI amended the schedule twice in August 2006 to reflect additional purchases.

Shortly thereafter, Bluegreen became aware of CFI's filing of its Schedule 13D and of the prospect that CFI could ultimately acquire a 32.1% stake in the company. In response, on July 27, 2006, the Bluegreen Board authorized the adoption of the Bluegreen Shareholders' Rights Plan (the "Rights Plan").[4]   As described by Bluegreen, the Rights Plan provides as follows:

> [I]f a person or group becomes a beneficial owner of 15% or more of the outstanding Bluegreen common stock, all shareholders other than such person or group have the right to purchase additional shares of Bluegreen at 50% of the then current market price, thereby diluting the interest of the person or group.  In recognition of the possibility that Siegel may surpass the 15% threshold of the Rights Plan through no further voluntary action of his own – as the put option holders have the right to force him to buy the shares subject to their options – the Bluegreen Board of Directors has provided that if [CFI] trigger[s] the 15% threshold by virtue of the exercise of existing put option contracts, [it] will be allowed 60 days to reduce [its] interest below the 15% level before the dilutive feature of the Rights Plan takes effect.

Complaint at ¶ 31 (DE 1).  The Bluegreen Board, however, expressly exempted Levitt, Bluegreen's largest shareholder, from the dilution and divestiture provisions of the Rights Plan.

According to CFI, on August 17, 2006, it held approximately 12% of Bluegreen common stock.  But on August 18, its holdings increased to approximately 31.7%, due to the exercise of puts, thereby triggering the Rights Plan's 60-day period. Consequently,

---

[4]  Shareholder rights plans are also known in the industry as "poison pills."

by October 18, 2006, CFI must reduce its holdings below 15% or face a dilution of its shares.

C.    The Claims

On July 27, 2006, Bluegreen filed a Complaint against CFI (Siegel, the Siegel Trust, and Central Florida Investments).  First, Bluegreen alleges that CFI violated Section 13(d) of the Exchange Act and Rule 13d-1 thereunder (Count 1).  More specifically, Bluegreen alleges that CFI's "campaign to accumulate a significant stake in Bluegreen shares through secret put option arrangements constituted an illegal plan or scheme to evade the reporting requirements of Section 13(d) and deprive Bluegreen shareholders of material information about [CFI's] activities, plans and intentions, as required by 13(d)."  Complaint at ¶ 34 (DE 1).  Bluegreen additionally alleges that CFI's Schedule 13D was incomplete and misleading in that it failed to disclose that CFI had proposed acquiring Levitt's stake in Bluegreen and that CFI intended to acquire control of Bluegreen.  Complaint at ¶ 8 (DE 1).  Second, Bluegreen alleges that through CFI's actions in connection with the "offer, sale, or purchase of investments and securities," it has "obtained and continue[s] to obtain property by the means of the concealment of material facts" in violation of the Florida Securities and Investor Protection Act (Count II).  Complaint at ¶ 46.  Finally, Bluegreen seeks a declaration that its Rights Plan was "justified under the circumstances" (Count III).  Complaint at ¶ 52 (DE 1).  CFI has answered the Complaint and asserted several affirmative defenses (DE 17).

On August 23, 2006, CFI asserted counterclaims against Bluegreen, as well as against the individual directors of Bluegreen (DE 18).  CFI seeks a declaration that the

July 27, 2006 Shareholder's Rights Plan enacted by Bluegreen's Board of Directors is "invalid, unjustified, and is an illegal impairment of CFI's holdings, its right to contract with the open market purchasers of Bluegreen Put contracts and of CFI's contractual relationship with Bluegreen" (Count 1). Counterclaims at ¶ 82 (DE 18). CFI additionally alleges that the Bluegreen Board of Directors and each of its members breached their fiduciary duties of good faith, fair dealing, due care, and loyalty to its shareholders, including CFI (Count II). More specifically CFI alleges as follows:

> The Board, and each Director, knowingly and purposely adopted an impermissibly retroactive, discriminatory, and punitive poison pill that injures CFI by: forcing CFI's shares to be divested or diluted; and diminishing CFI's voting power as a shareholder of Bluegreen. The Board did so with the purpose of entrenching itself and Bluegreen's controlling shareholder, Levitt, at the expense of CFI and other non-controlling shareholders. The Board and each Director, acted in self-interest and in derogation of the interests of Bluegreen's shareholders. These actions were not a good faith exercise of prudent business judgment to protect and promote Bluegreen's corporate interests.

Counterclaims at ¶ 94 (DE 18).

## II.   MOTION FOR INJUNCTIVE RELIEF

On August 24, 2006, CFI filed the instant Emergency[5] Motion for Temporary Restraining Order and Preliminary Injunction (DE 19). Bluegreen has filed a response in opposition to the motion (DE 52), and CFI has replied thereto (DE 70).[6] On September 25,

---

[5] On August 25, 2006, the District Court found there existed no "emergency in the matter" and, accordingly, it denied CFI's request for emergency relief. Order at ¶ 1 (DE 21).

[6] The parties have engaged in discovery relating to the issues raised by CFI's motion for injunctive relief.

2006, the undersigned heard argument of counsel on CFI's motion for injunctive relief. The motion is now ripe for decision.

A.     The Parties' Arguments

CFI requests the Court to enjoin Bluegreen from implementing or enforcing the Shareholders' Rights Plan, pending resolution of this case. CFI argues that "such plans typically apply prospectively, providing notice to investors that an acquisition of shares may trigger dilution." By contrast, according to CFI, Bluegreen's Rights Plan "applies retroactively to require CFI to divest existing holdings. In other words, the Shareholders' Rights Plan was adopted in a triggered state and without threat, a remarkable fact given that, to CFI's knowledge, no poison pill, until now, has ever been triggered in the history of corporate governance." Motion at 2 (DE 19) (emphasis in original). CFI contends that because it has not launched any takeover of the company, the Plan does not accomplish or even relate to its stated goal – "to assure that all of Bluegreen's shareholders receiver fair and equal treatment in the event of any proposed takeover of the Company and to guard against abusive tactics to gain control of Bluegreen without paying all shareholders a premium for that control." Motion at 8 (DE 19) (citing Crabtree Aff., Ex. B (Bluegreen Press Release and Shareholders' Rights Plan); Ex. A (Compl. at ¶ 30)). CFI argues that Bluegreen's true purpose in enacting the plan was to benefit the controlling shareholder (Levitt), which owns Bluegreen shares in an amount that would otherwise require divestiture but is expressly exempted under the terms of the Plan. According to CFI, this preferential treatment was afforded to Levitt because Levitt was able to control the Bluegreen Board "through stock ownership and interlocking directors, resources and

8

relationships." Motion at 9 (DE 19).

Much as CFI stresses the unprecedented nature of the (allegedly) retroactive portion of Bluegreen's Rights Plan, so too Bluegreen stresses the unprecedented nature of CFI's (alleged) attempt to surreptitiously acquire control of the company through the sale of puts. Bluegreen argues that CFI's acquisition scheme "was designed to maintain secrecy, permit [CFI] to continue to build up [its] stake and evade the federal securities laws," as evidenced, *inter alia*, by the fact that at the same time CFI was entering into "in the money" puts, it was selling shares on the open market. Opposition Memorandum at 19 (DE 52). Upon first learning of CFI's 13D filing, Bluegreen grew alarmed:

> The obvious concern was that Mr. Siegel, the controlling shareholder and President of a competitor, in very short order could wind up controlling a blocking stake in the company and, indeed, could even go into the market and wind up owning 51%. If Mr. Siegel was not stopped, he could end up seizing control of Bluegreen without negotiating with the Board and paying premium to Bluegreen's shareholders.

Opposition Memorandum at 25 (DE 52). Additionally, with a 32.7 % interest, CFI would (as a practical matter) be able to veto any merger, even if Bluegreen's board determined that such a merger would be in the best interests of all its shareholders. Based on these concerns, Bluegreen's board adopted its Rights Plan. According to Bluegreen, the Plan provision allowing a shareholder triggering the 15% threshold to avoid dilution by promptly divesting its shares and reducing its interest is standard. Recognizing that CFI's counterparties to the puts had the right to require CFI to buy their shares, Bluegreen included the unique provision that grants CFI 60 days to reduce its interest below the threshold level; the dilutive feature, therefore, would only be triggered were CFI's interest to remain at or above 15% at the close of the 60-day period.

Further, Bluegreen denies CFI's contention that the Rights Plan was adopted in a "triggered state." At the time of the Plan's adoption, CFI owned 7.7% of the Bluegreen

shares, well below the 15% trigger. In response to CFI's contention that it was obligated to purchase additional shares under its outstanding put contracts and, therefore, could not avoid triggering the 15% threshold, Bluegreen argues that CFI could have purchased puts to offset its outstanding puts (as is commonly done in the market). Indeed, Bluegreen contends that at the time it adopted the Rights Plan, CFI had four choices:

> (i) close out a portion of [its] put contracts in the market and accept the losses, if any, between the price [it] would have to pay to liquidate the contracts and the premiums [it] had earned when [it] entered into them; (ii) immediately enter into discussions with Bluegreen's Board of Directors to disclose [its] plans and attempt to arrive at an agreement for ownership for all or part of the company in a manner that would address the Board's concerns; (iii) acquire the shares and then avail [itself] of the 60-day window to reduce [its] stake below 15% or (iv) close on the shares notwithstanding the rights plan in hopes that a court would relieve [it] from the problems [it] had created. [CFI] chose the last option.

Opposition Memorandum at 7-8 (DE 52).

B.    The Legal Framework

In considering whether a movant merits preliminary injunctive relief, a court must determine whether such movant has demonstrated that "(1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." Seigel v. LePore, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc); see also BellSouth Telecomms, Inc. v. MCIMetro Access Transmission Servs., LLC, 425 F.3d 964, 968 (11th Cir. 2005) (setting forth elements necessary for preliminary injunction); Four Seasons Hotels and Resorts, B.V. v. Consorcio Barr, S.A., 320 F.3d 1205, 1210 (11th Cir. 2003) (same); McDonald's Corp. v. Robertson, 147 F.3d 1301, 1306 (11th Cir. 1998)

(same).[7]  A preliminary injunction, however, "is an extraordinary and drastic remedy not to be granted unless the movant clearly established the 'burden of persuasion' as to each of the four prerequisites." Siegel, 234 F.3d at 1176 (quoting McDonalds, 147 F.3d at 1306) (internal quotation marks omitted).

The Eleventh Circuit has stated that "[a] showing of irreparable injury is 'the sine qua non of injunctive relief.'" Id. (quoting Northeastern Fla. Chapter of Ass'n of Gen Contractors v. City of Jacksonville, 896 F.2d 1283, 1285 (11th Cir. 1990) (quoting Frejlach v. Butler, 573 F.2d 1026, 1027 (8th Cir. 1978)); see also Sampson v. Murray, 415 U.S. 61, 88 (1974) ("The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies."); City of Jacksonville, 896 F.2d at 1285 (reversing preliminary injunction solely on failure to demonstrate irreparable injury). "An injury is 'irreparable' only if it cannot be undone through monetary remedies." Id.

Further, the alleged irreparable injury "must be neither remote nor speculative, but actual and imminent." Id. (quoting City of Jacksonville, 896 F.2d at 1285) (quoting Tucker Anthony Realty Corp. v. Schlesinger, 888 F.2d 969, 973 (2d Cir. 1989)); accord Chacon v. Granata, 515 F.2d 922, 925 (5th Cir. 1975) ("An injunction is appropriate only if the anticipated injury is imminent and irreparable.").

C.    Irreparable Injury

CFI first argues that if this Court does not issue an injunction maintaining the status quo, Bluegreen "will successfully have enforced their unprecedented and punitive

---

[7]  The standards of review for a temporary restraining order and a preliminary injunction are the same. United States v. Metro. Dade County, Fla., 815 F. Supp. 1475, 1477 (S.D. Fla. 1993) (Highsmith, J.).

Shareholders' Rights Plan simply by requiring divestiture within a time period too short to permit adjudication." Motion at 32 (DE 19). CFI contends that its "ability to so shield the improper Shareholders' Rights Plan from judicial review itself represents irreparable harm." Id. (citing Alabama v. U.S. Army Corps of Eng'rs, 424 F.3d 1117, 1128 (11th Cir. 2005); ODS Techs, L.P. v. Marshall, 832 A.2d 1254, 1262-63 (Del. Ch. 2003)). CFI's argument is not persuasive. Even if injunctive relief is not granted, the validity of Bluegreen's Rights Plan can still be adjudicated by the Court. Only the relief CFI seeks would differ – monetary damages, rather than injunctive relief.

CFI next argues that were it required to divest its shares, it would face a difficult, if not impossible, task in calculating its damages. According to CFI, the proper measure of damages would be the difference between the share price at the time it was forced to divest and the share price at whatever future time, it might have decided to sell; it contends that it would be impossible to determine that amount at trial. The undersigned, however, does not agree and believes that financial experts would be able to establish appropriate damages. By way of example only, were CFI to prevail on the merits, it could be made whole by being awarded the difference between the share price on the date of the divestiture and the share price on (or about) the date of the judgment. Damages in such a sum would enable CFI to then reacquire the number of shares of which it had been divested.

CFI additionally argues that without injunctive relief it would be required to sell more than 5 million shares of Bluegreen common stock within 60 days (now less than 60 days). CFI contends that with a daily Bluegreen trading volume of only 218,623 shares, its forced

12

divestiture would flood the market and "punish" Bluegreen's stock price, harming not only CFI, but all shareholders.  Again, however, any diminution in the value of CFI's shares could be remedied monetarily.  See Hastings-Murtagh v. Texan Air Corp., 649 F. Supp. 479, 487 (S.D. Fla. 1986) (King, J.) ("[I]f the shareholders are deprived of an adequate consideration for their shares, they may seek damages in an action at law. . . .").

CFI next argues that it may suffer irreparable harm if it is unable to collect on a multimillion dollar judgment against Bluegreen.  Yet, at the hearing, CFI was unable to proffer any evidence that Bluegreen would be unable to satisfy a judgment.  Indeed, Bluegreen represented to the Court that it was a $500 million company and would be able to satisfy any judgment that CFI might obtain.

Finally, CFI argues that "[a]n ownership interest in a public corporation is a unique property right that has many non-monetary benefits that simply cannot be replaced by dollars, including voting rights, the right to participate in shareholder meetings and the right to information."  Motion at 32-33 (DE 19).  Yet, even if CFI's holdings were to drop below 15%, CFI would nonetheless remain a shareholder entitled to obtain information and participate in meetings.  And the loss of voting rights does not constitute irreparable harm, at least where, as here, the movant is not a controlling shareholder and does not intend a takeover of the company.[8]  See Parrott v. Pasendena Capital Corp., No. 96 Civ. 6234 (JFK), 1997 WL 13205, at *3-4 (S.D.N.Y. Jan. 15, 1997).

In Parrott, the plaintiff brought a wrongful discharge action against his former

---

[8]  CFI has repeatedly and emphatically disclaimed any intention to take over Bluegreen.

employer and sought a preliminary injunction enjoining the employer from exercising its right to re-purchase much of the stock he had acquired pursuant to stock purchase agreements. After the plaintiff's termination, the defendant informed the plaintiff that under (section 4(b) of) the plan, it would purchase the stock by making monthly payments to him. In his request for injunctive relief, the plaintiff argued that if the defendant were permitted to make the monthly payments, yet the court were later to determine that he had been wrongfully terminated (and therefore that section 4(b) should not have been triggered), he would be irreparably injured.  He argued that money damages would not adequately compensate him for his loss of ownership of company stock, which loss included denial of his right to vote his shares and to exercise control over the corporation.  The court rejected the plaintiff's argument, holding that his loss of stock ownership benefits did not amount to irreparable harm.  Further, the court noted that as a minority shareholder, the plaintiff would not be losing any right to exercise control over the defendant company because he had never enjoyed such control.  Finally, the court noted that because the plaintiff would still retain some stock, he would also retain his rights as a shareholder. Having concluded that the plaintiff had failed to demonstrate irreparable harm, the court determined that it did not need to reach the other elements and denied injunctive relief.

Similarly, because CFI has failed to demonstrate that it would suffer irreparable harm if injunctive relief were not granted, the undersigned need not reach its arguments as to the likelihood of success on the merits or as to the balance of the equities.  As the Eleventh Circuit has noted: "Significantly, even if [the movant] establish[es] a likelihood of success on the merits, the absence of a substantial likelihood of irreparable injury

14

would, standing alone, make preliminary injunctive relief improper." Siegel, 234 F.3d at

1176 (citing Snook v. Trust Co. of Georgia Bank of Savannah, N.A., 909 F.2d 480, 486

(11th Cir. 1990) (affirming denial of preliminary injunction where plaintiff failed to establish

irreparable harm even though plaintiff established likelihood of success on merits)).

III.    RECOMMENDATION

Because CFI has failed to meet its burden of demonstrating that it will suffer

irreparable harm if a preliminary injunction is not issued, the undersigned RECOMMENDS

that the District Court DENY Defendants'/Counter Plaintiffs' Emergency Motion for

Temporary Restraining Order and Preliminary Injunction (DE 19).

The parties will have three (3) days from the date of being served with a copy of this

Report and Recommendation within which to file written objections, if any, with the

Honorable Daniel T. K. Hurley, United States District Judge, and the parties shall have

three (3) days to respond to any objections filed.[9] Failure to file objections timely shall bar

the parties from a de novo determination by the District Judge of an issue covered in the

report and shall bar the parties from attacking on appeal factual findings accepted or

---

[9] Generally, parties are afforded ten days after service of a magistrate judge's report and recommendation to file written objections. 28 U.S.C. § 636(b)(1)(C). However, where exigencies exist, a court may shorten the time for filing objections.  See United States v. Barney, 568 F.2d 134, 136 (9th Cir. 1978) (holding that trial court did not err in providing parties less than the full ten-day period to file objections to the magistrate's report and recommendation where exigencies existed, stating "[t]en days days is a maximum, not a minimum"); Hispanic Counseling Center, Inc. v. Incorporated Village of Hemptstead, 237 F. Supp. 2d 284, 290 (E.D.N.Y. 2002) (court may shorten time period for filing objections where exigencies exist). Exigencies exist in this case - if injunctive relief is not granted by October 18, 2006, CFI must either reduce its holdings of Bluegreen common stock below 15% or suffer dilution. Moreover, the parties here have agreed to the three-day periods for filing an objection and a response thereto.

adopted by the District Court except upon grounds of plain error or manifest injustice.  See 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140, 149 (1985); Henley v. Johnson, 885 F.2d 790, 794 (1989).

DONE AND SUBMITTED at Fort Lauderdale, Florida, this day of September 2006.

BARRY S. SELTZER
United States Magistrate Judge

Copies to:

Honorable Daniel T. K. Hurley
United States District Judge

Eugene F. Stearns, Esq.
Stearns Weaver Miller Weissler
  Alhadeff & Sitterson, P.A.
150 West Flagler St., Suite 2400
Miami, FL  33130

Marc Wolinsky, Esq.
Wachtell Lipton Rosen & Katz
51 West 52nd St.
New York, NY  10019

Glenn Kurtz, Esq.
White & Case LLP
1155 Avenue of the Americas
New York, NY  10036-2787

Michael Marder, Esq.
Greenspoon Marder, P.A.
201 East Pine St., Suite 500
Orlando, FL  32801

Richard W. Epstein, Esq.
Greenspoon Marder, P.A.
100 West Cypress Creek Rd.
Fort Lauderdale, FL  33309